UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KENNETH SOUTHERLAND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No.  4:11CV1902 JAR |
| | )                      (TIA) |
| CAROLYN W. COLVIN,[1] | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. § 405(g) for judicial review of the denial of

Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).

## I.  Procedural History

On July 55, 2009, Plaintiff protectively filed an application for Disability Insurance Benefits,

alleging disability beginning July 1, 2009 due to heart problems with five stents, chest pain, high blood

pressure, blindness in right eye, deafness in left ear, and sleep apnea.  (Tr. 9, 85, 145-51)  The

application was denied on October 20, 2009, after which Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ").  (Tr. 83-89, 141)  On December 8, 2010, Plaintiff testified at a

hearing before the ALJ.  (Tr. 24-82)  In a decision dated February 7, 2011, the ALJ found that

Plaintiff had not been under a disability from July 1, 2009 through the date of the decision.  (Tr. 9-19)

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is
therefore substituted for Michael J. Astrue as the Defendant in this action.

The Appeals Council denied Plaintiff's request for review on September 28, 2011. (Tr. 1-3) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  The ALJ questioned Plaintiff, who testified that he was 45 years old and had a 12th grade education.  He was unmarried but had been married in the past.  Plaintiff did not have children.  He weighed 236 pounds and measured 5 feet 11 inches tall.  Plaintiff was able to read, write, and perform simple arithmetic.  He had been receiving unemployment benefits since August 2009.  In order to draw unemployment, Plaintiff had to tell the unemployment agency that he was ready, willing, and able to work, and he had to actively seek work.  However, Plaintiff testified that he was not able to work.  The ALJ noted the inconsistency between filing for unemployment benefits and claiming to be disabled.   Plaintiff previously filed a claim for worker's compensation for a back injury and settled with the company, Raw Water Beds, later named The Bedroom Store. Plaintiff had been receiving Medicaid benefits for at least the past 6 months.  (Tr. 29-33)

Plaintiff testified that he last worked on July 1, 2009.  Plaintiff worked delivering bedroom furniture for approximately 10 to 12 years.  The company changed its name several times over the course of Plaintiff's employment.  Plaintiff and a coworker would carry furniture up and down stairs. He also used a power drill.  Plaintiff then became a customer service warehouse manager for the same company.  Plaintiff's duties included speaking to customers and handling complaints, as well managing customer service representatives.  Plaintiff stated that he split his time between delivering furniture and working in customer service.  He was then promoted to warehouse manager.  Plaintiff drove a forklift, unloaded trucks, and organized furniture.  Plaintiff was also had responsibilities in

shipping, inventory, and hiring and firing employees. He testified that he had to work alongside the other warehouse employees. (Tr. 33-39)

With regard to his medical condition, Plaintiff testified that he had a heart problem. He suffered a heart attack in 2005 which resulted in six surgeries, one approximately every six to eight months. The longest time period between surgeries was about a year. Plaintiff also stated that he was legally blind in his right eye since age 13. He had been able to adapt in the workplace; however, he sometimes had trouble driving the forklifts. Plaintiff was able to see out of his left eye. Additionally, he was unable to hear out of his left ear. Plaintiff's hearing problems began eight or nine years ago, and he testified he had been able to work with this condition. Plaintiff was diagnosed with sleep apnea. He had a CPAP machine, but it no longer had oxygen. He continued to use the machine with a mask that went over the nostrils and mouth. Plaintiff testified that he was able to sleep through the night with the use of the machine. Plaintiff also took a sleeping pill each night. with the CPAP machine and the sleeping pill, Plaintiff woke up a little tired. (Tr. 39-46)

With regard to medications, Plaintiff stated that he took a pill for high blood pressure and aspirin. The blood pressure medication controlled Plaintiff's high blood pressure. Plaintiff also took medication for depression. He was prescribed an antidepressant to cope with his heart problems and inability to work. Plaintiff further testified that he experienced fatigue and headaches. Plaintiff did not smoke, but he occasionally drank beer. He did not take illegal drugs. Plaintiff was able to drive. He lived alone in a ranch house with a basement. He threw the dirty clothes down the stairs to do laundry and stated that it was difficult to come back up. He left most of his clothes in the basement and only brought up towels and underclothes in the basket. Plaintiff cooked occasionally but often went by his parents' house. Plaintiff cooked meals that did not take long to prepare. He was unable

to cook a big meal. He was able to wash dishes by hand, do laundry, vacuum, and do yard work. His nephew helped with the yard work and cleaned the gutters. Plaintiff went grocery shopping but used a cart because he would get tired. (Tr. 47-53)

During a typical day, Plaintiff woke up at 7:00 AM and cooked oatmeal for breakfast. Then he took a shower and fiddled around on the computer. He had a Facebook account but had not been on the computer for awhile because he could not afford internet service. He had about 30 Facebook friends that consisted mostly of family. Plaintiff was able to do online banking and pay bills online by taking his laptop computer to the library. He also used his brother's computer when he visited his parents. Plaintiff changed from pajamas to clothes around 2:00 PM if he planned to leave the house. Plaintiff visited with a good friend who lived near his parents. He also visited his parents at least 4 times a week. He would go to their house after rehab around 3:00 or 3:30 in the afternoon, then stay until about 10:30 at night. Plaintiff testified that his mother had a heart condition, and his father was retired. Both parents were diabetic. Plaintiff was able to mow the lawn when necessary, but his nephew usually did the mowing. Plaintiff also took walks around the block and watched ball games at the Catholic school across the street. Although Plaintiff previously reported being able to lift 50 to 75 pounds, he was no longer able to do so. He could lift a case of water, which was about 27 pounds. However, Plaintiff stated that he could not lift a lot of heavy items or carry them far. (Tr. 53-60)

Plaintiff last received a stent in September of 2010. Plaintiff acknowledged that a doctor previously provided lifting restrictions to no more than 10 pounds frequently and 20 pounds occasionally. He discontinued lifting weights at cardiac rehabilitation because it caused back and muscle strain. Instead, he used a treadmill during his rehab sessions. Testing in early 2010 showed

an ejection fraction of 60 percent. Dr. Band, Plaintiff's cardiologist, provided a letter in September of 2010 indicating that Plaintiff was largely incapacitated by coronary disease and that, in his opinion, Plaintiff should be eligible for disability. However, Dr. Band refused to complete a form indicating Plaintiff's exact limitations. The ALJ left the record open to ensure he had all the ejection fraction test results and to allow a doctor to comment on Plaintiff's limitations and the grade of his heart condition. (Tr. 60-67)

Plaintiff's attorney also questioned the Plaintiff, who testified that he attended auto mechanic school at South County Tech. However, he never used his degree. He applied to the military and tried to become a police officer but was rejected because he did not have peripheral vision. Plaintiff also explained that he tried to get unemployment in order to pay the bills. However, he had been unsuccessful. (Tr. 67-69)

With regard to headaches stemming from Plaintiff's nitroglycerine prescription, Plaintiff testified that they lasted two to three hours, sometimes longer. Prior to being laid off, Plaintiff missed work due to doctor's appointments and rehab. In fact, Plaintiff was laid off while on sick leave. (Tr. 69-71)

Upon reexamination by the ALJ, Plaintiff stated that heat and cold affected his condition. Working in cold conditions caused pain and necessitated stopping and taking breaks. He was unable to shovel snow because bending over and lifting caused chest pains. In addition, Plaintiff was unable to go outside during hot and humid weather. Plaintiff had not attended counseling or seen a psychiatrist for depression. The doctor's office merely prescribed medication. Plaintiff also stated that he had attended a Cardinals baseball game. The seats were down low, and Plaintiff did not think he would have been able to make it up to higher seats. (Tr. 71-74)

5

The ALJ also examined a Vocational Expert ("VE") regarding Plaintiff's ability to work. The VE stated that he looked for jobs in a region made up of Nebraska, Kansas, Missouri, and Iowa. Plaintiff's past relevant work consisted of delivery driver, which was semi-skilled, medium work; warehouse supervisor, which was skilled work performed at the light level according to the DOT and at the heavy level as Plaintiff performed it; and customer service supervisor, which was skilled, light work, but medium to heavy as performed by Plaintiff. He did have acquired skills which he could use in other jobs, such as the knowledge of the delivery process and procedure, ability to communicate effectively with others, and knowledge of and ability to operate an office and equipment and machinery. (Tr. 76-77)

The ALJ then asked the VE to assume a hypothetical individual with Plaintiff's education, training, and work experience, who could perform light work. He could climb stairs and ramps occasionally; never climb ropes, ladders, or scaffolds; stoop kneel, and crouch occasionally; and never crawl. Additionally, Plaintiff needed to avoid concentrated exposure to extreme head and cold. When asked if the individual could perform any of Plaintiff's past relevant work, the VE stated that the individual would be unable to perform any past work as Plaintiff described it. However, according to the DOT, the warehouse supervisor and customer service supervisor was within the range of the hypothetical. (Tr. 77-78)

For the second hypothetical, the ALJ asked the VE to assume that the person must avoid even moderate exposure to extreme cold and heat. The individual could understand, remember, and carry out at least simple instructions and non-detailed tasks, as well as demonstrate adequate judgment to make simple work-related decisions. Further, the person could adapt to a routine, adapt to simple work changes, perform repetitive work according to set procedure; and perform some complex tasks.

6

Given this hypothetical, the VE testified that the individual could not perform Plaintiff's past relevant work. However, he could perform work as a hand packer, which was light and unskilled, and as a messenger, which was also light and unskilled. (Tr. 78-79)

For the third hypothetical, the ALJ added the need of two random, additional breaks for up to one hour twice a week. Given the need for the additional breaks, the person could perform that work only with approval and accommodation from the employer. (Tr. 79-80)

In a Function Report – Adult, Plaintiff stated that he was able to prepare sandwiches, complete meals, and frozen dinners daily. However, most of the time he ate out. He could not stand long while cooking because he became tired. Plaintiff could clean, do laundry, iron, and sometimes mow the lawn. Cleaning the house took about 3 hours once a week, and laundry took about a half day once or twice a week. He ironed about 2 items daily, which took approximately 5 to 15 minutes. He went outside every day and was able to shop for food, personal goods, and clothing. Plaintiff's interests included watching TV, walking, and playing with photo shop on the computer. His social activities included taking walks, going out to dinner, talking, using the computer, and going to ball games. However, he stated that he stayed home a lot. His conditions affected his ability to lift, squat, bend, stand, walk, kneel, hear, stair climb, see, complete tasks, and use hands. Plaintiff could lift 50 to 75 pounds and walk 5 to 7 blocks before needing to rest for 2 to 5 minutes. He was able to pay attention, follow instructions, and get along with authority figures. He did not handle stress well. (Tr. 200-07) Plaintiff also listed his medications, which consisted of Effient, Crestor, Metoprolol, Niaspan, Mirtazapine, Zolpidem, Nitroglycerin, fish oil, and Aspirin. (Tr. 222)

### III. Medical Evidence

On December 20, 2005, Plaintiff was admitted to the hospital for unstable angina. Cardiac

catheterization revealed a RCA blockage of 99 percent and 80 percent. Subsequent stent placement revealed blockage of zero percent. Ejection fraction was 55 percent. Plaintiff was discharged on December 21, 2006 in no discomfort. Dr. Toniya Singh advised Plaintiff to return in four weeks and to resume cardiac rehabilitation in one week. (Tr. 291-301)

Plaintiff was again hospitalized from April 14 to 15, 2006 with chest pain. Dr. Singh confirmed Plaintiff had a history of inferior wall myocardial infarction (MI) three months ago, for which he was stented with a Taxus stent in the right coronary artery. He then developed instant re-stenosis and underwent stenting with a Cypher in the same location. He returned with chest pain, and Dr. Singh found a lesion proximal to the previous stent insertion. Plaintiff underwent a 3x13 mm Cypher stent in the RCA with no complications. Dr. Singh advised Plaintiff to follow up in four weeks and return to work in one week. (Tr. 685-87)

On December 11, 2006, Plaintiff underwent a cardiac catheterization, which demonstrated significant lesions in his RCA from re-stenosis and a new De Novo lesion. The catheterization revealed a 90% in-stent and 80% distal to that. Plaintiff elected to have a drug-eluting stent, which would require potential life-long Coumadin, versus coronary artery bypass surgery to a single vessel. Discharge diagnoses included: recurrent re-stenosis of the right coronary artery, treated with two Cypher stents; probable ischemic-induced left ventricular dysfunction with ejection fraction of 40%, which should go back to normal in time; high cholesterol, under treatment; family history of heart disease; history of tobacco and alcohol use, with encouragement to discontinue; history of cardiac arrest with an inferior myocardial infarction last year; status-post ECP; and negative carotids. (Tr. 601-04)

On October 1, 2008, Plaintiff attended a 6-month follow up appointment with Dr. Singh.

Plaintiff's physical examination was essentially normal, with clear lungs, no edema, and normal gait and muscle strength. His cardiomyopathy, coronary artery disease, hypertension, and sleep apnea were improved. He had excellent exercise tolerance, but EKG stress test shoed late positive for ischemia. Dr. Singh advised Plaintiff to return in 6 months, and she recommended that he start or continue a regular exercise program. (Tr. 240-44)

On April 10, 2009, Dr. Singh examined Plaintiff for a general cardiology follow-up. Plaintiff complained of chest pain with exertion and shortness of breath, among other things. On examination, he was well developed and in no apparent distress. His lungs were clear, gait was appropriate, and muscle strength was normal. Nuclear stress findings showed excellent exercise tolerance and late positive EKG stress test for ischemia. He also had normal myocardial perfusion without infarct or ischemia. His cardiomyopathy, hypertension, and sleep apnea were improved with medication. (Tr. 246-50)

On July 10, 2009, Plaintiff reported chest pain with exertion and shortness of breath. However, he denied chest pain at rest, chest pain at night, palpitations, PND, orthopnea, edema, claudication, syncope, near-syncope, dizziness, and medication side effects. He was recently laid off work and was experiencing a lot of stress. Dr. Singh diagnosed cardiomyopathy with an ejection fraction of 50%, improved; history of dizziness with normal carotid in 2005; sleep apnea; hypertension; and coronary artery disease status-post multiple RCA stents, now has drug-eluting stents. (Tr. 252-55)

Echocardiographic report dated July 14, 2009 showed mild concentric left ventricular hypertrophy with normal left ventricular systolic function; estimated left ventricular ejection fraction (LVEF) of 65%; normal LV diastolic function; mildly thickened aortic valve; and, otherwise, no

significant valvular abnormalities. (Tr. 256-57)

On December 18, 2009, David Ban, M.D., examined Plaintiff. Dr. Ban noted that Plaintiff was unemployed and trying to get disability. Plaintiff was worried and appeared depressed. Plaintiff was in no apparent distress, and his affect was normal. Dr. Ban opined that Plaintiff was limited in his ability to walk, had major problems with sleep at night, had frequent headaches, and was now on a higher dose of niacin. Dr. Ban noted decreased hearing in Plaintiff's left ear, vision loss in the right eye, severe dyspnea, orthopnea, chest pain, and insomnia. He assessed coronary atherosclerosis of unspecified type of vessel; pure hypercholesterolem; hypertension NOS; and obstructive sleep apnea, improved. (Tr. 324-27)

On that same date, Dr. Ban wrote a letter on Plaintiff's behalf, indicating that Plaintiff had Class 3 to 4 heart disease, which significantly limited his functional capacity due to severe coronary artery disease. In addition, Plaintiff had obstructive sleep apnea and was unable to work for eight hours continuously. Further, he had marked limitations in his physical abilities and had significant dyspnea with minimal exertion of about two blocks walking. His prognosis for improvement was limited. Dr. Ban further noted that Plaintiff was on optimal medication and was followed closely by his cardiologist. He used nitroglycerin about five times weekly, in spite of other medications. (Tr. 285)

On January 22, 2010, Dr. Singh completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). Dr. Singh opined that Plaintiff could lift/carry up to 10 pounds frequently and up to 20 pounds occasionally. He was limited by shortness of breath, headaches, dizziness with heavy lifting, and tiredness throughout the day as a result of sleep apnea. Plaintiff could sit one hour, stand 5 minutes, and walk 30 minutes at one time and total in an 8-hour work day.

Further, Dr. Singh reported that Plaintiff required rest and breaks. He could occasionally reach and handle, continuously finger and feel, and push/pull occasionally depending on the weight. Plaintiff's arms became tired, and he experienced pain in his wrists, arms, and back. In addition, Dr. Singh opined that Plaintiff could occasionally operate foot controls but that his ankles got tired. Plaintiff could never climb ladders or scaffolds; balance; stoop; kneel; crouch; crawl; work at unprotected heights; work around moving mechanical parts; work in humidity or wetness; work around dust, odors, fumes and pulmonary irritants; or work in extreme cold or extreme heat. He could occasionally operate a motor vehicle and occasionally climb stairs and ramps. Plaintiff was able to shop; travel without assistance; ambulate without a wheelchair, walker, 2 canes or 2 crutches; walk a block at a reasonable pace on uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal; and care for personal hygiene. (Tr. 346-51)

Dr. Singh admitted Plaintiff to the hospital from February 3 to 4, 2010 for complaints of chest pain. Cardiac catheterization on February 3, 2010 revealed single-vessel disease involving a 70% lesion distal to the previously placed Cypher stent. Plaintiff successfully underwent elective angioplasty and stenting of the right coronary artery of stenosis from 80% to 0% with a 3 x 13 mm Cypher stent. Discharge diagnoses included single-vessel coronary artery disease with an area of stenosis past the Cypher stent; status-post new 3x13 Cypher stent RCA; hypertension, controlled; hyperlipidemia, on appropriate medication; and shortness of breath. Dr. Singh noted Plaintiff had sleep apnea and used a CPAP machine. Discharge procedure orders stated that Plantiff could return to work in four days. He could not drive or bathe in the tub for four days. Further, Plaintiff could not lift more than 10 pounds or perform exercise or strenuous activity for one week. Hospital notes

also indicate that Plaintiff planned to attend outpatient cardiac rehabilitation. (Tr. 359, 445-94)

Plaintiff was re-admitted to the hospital from February 5 to 7, 2010 after complaining of increased groin pain and tenderness. Plaintiff was diagnosed with a surgical site infection of the left groin area with cellulitis. Plaintiff was discharged with antibiotics. (Tr. 831-98)

Plaintiff attended cardiopulmonary rehabilitation from March 8, 2010 through June 2, 2010. (Tr. 900-61)

On September 2, 2010, Dr. Ban wrote a letter indicating that his office had been following Plaintiff for multiple medical conditions, including premature coronary artery disease, hypertension, hypercholesterolemia, and obstructive sleep apnea. Dr. Ban also noted that Dr. Tonyia Singh, Plaintiff's cardiologist, followed Plaintiff as well. Further, Dr. Ban noted Plaintiff's recent stent placement for in-stent re-stenosis. Dr. Ban opined that Plaintiff was largely incapacitated by his coronary disease, despite optimal medical management and multiple procedures for re-stenosis. Dr. Ban concluded that Plaintiff should be eligible for disability on this basis. (Tr. 288)

Dr. Singh admitted Plaintiff to the hospital on September 1, 2010 for chest pain. Cardiac catheterization revealed focal 90% stenosis in the previously placed Cypher stent. Left ventriculography revealed hypokinesis of the posterobasal segment with otherwise preserved LV systolic function and an ejection fraction of 55%. Plaintiff underwent successful stenting of the mid-right coronary artery using a Xience medicated stent. He was discharged the following day in stable condition. Plaintiff could resume normal activity in 24 hours. (Tr. 1002-13)

On September 29, 2010, Dr. Singh drafted a letter indicating that Plaintiff had been under her care since 2005. Plaintiff's original event was a ST elevation myocardial infarction with a cardiac arrest, for which he underwent stents. Dr. Singh further noted that Plaintiff needed six other stents

since then and had been diagnosed with hypertension, elevated cholesterol, and sleep apnea. Plaintiff had significant shortness of breath and difficulty working for prolonged periods of time. (Tr. 290)

Plaintiff attended cardiopulmonary rehabilitation beginning October 7, 2010. The most recent session in the medical record was November 17, 2010. (Tr. 962-99)

On December 20, 2010, Dr. Singh opined that Plaintiff suffered from fatigue on exertion, dyspnea on mild exercise, and anginal discomfort. Plaintiff had New York Heart Association Class II heart failure, defined as patients with slight, mild limitation of activity that were comfortable with rest or with mild exertion. (Tr. 1021)

On April 20, 2011, Dr. Singh confirmed she had been treating Plaintiff for coronary artery disease since 2005. Dr. Singh outlined Plaintiff's treatment history, noting his multiple repeat stenting. Dr. Singh stated that during the treatment period, Plaintiff continued to have increasing episodes of shortness of breath and chest discomfort, with multiple medications for angina. Further, his exercise capacity had become diminished. Plaintiff was diagnosed with sleep apnea and used a CPAP for that. However, he continued to become short of breath easily with exertion. Dr. Singh also noted that Plaintiff was very compliant with this medications and followup visits, but he continued to have angina and dyspnea on exertion. (Tr. 1023)

### IV. The ALJ's Determination

In a decision dated February 7, 2011, the ALJ found that the Plaintiff met the insured status requirement of the Social Security Act through December 31, 2014. He had not engaged in substantial gainful activity since July 1, 2009, his alleged disability onset date. The ALJ further found that Plaintiff had the severe impairments of coronary artery disease with seven stents, New York Heart classification II, sleep apnea, obesity, and blindness in the right eye. However, he did not have

an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 9-12)

After carefully considering the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), with several limitations. Plaintiff could occasionally climb stairs and ramps, stoop, kneel, and crouch. He could never crawl or climb ropes, ladders, or scaffolds, and he needed to avoid even concentrated exposure to extreme cold and heat. The ALJ assessed Plaintiff's hearing testimony and function report, as well as the medical evidence and treatment history in the record. The ALJ noted Plaintiff's good work history. The ALJ afforded considerable weight to Plaintiff's cartiologist, Dr. Singh, and the Physical Medical Source Statement she submitted. The ALJ thus found that Plaintiff was capable of performing past relevant work as a warehouse supervisor and customer service supervisor, as generally performed and described in the Dictionary of Occupational Titles. The positions did not require the performance of work-related activities precluded by Plaintiff's RFC. Therefore, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 1, 2009 through the date of the decision. (Tr. 12-19)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step

evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523,

527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises two arguments in his brief in support of the complaint. First, Plaintiff asserts that the ALJ failed to properly consider opinion evidence. Next, Plaintiff argues that the ALJ failed to elicit testimony from the VE to clarify an apparent conflict with the DOT. Defendant responds that the ALJ properly gave less than controlling weight to the opinion of Plaintiff's treating physician and

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

properly relied on the testimony of the VE.  After fully considering the entire record and the briefs, the undersigned finds that substantial evidence supports the ALJ's determination such that the decision of the Commissioner denying benefits should be affirmed.

### A.  Opinion Evidence from Treating Physician

Plaintiff first argues that the ALJ erred in failing to give Dr. Singh's opinion controlling weight.  Specifically, Plaintiff contends that the ALJ disregarded many of the limitations set forth by Dr. Singh without providing good reason for doing so.  "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); see also SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.").  Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements."  Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

As noted by the ALJ, Dr. Singh was Plaintiff's treating physician.  The ALJ afforded her opinion significant weight and then determined that not all aspects of her opinion were entitled to substantial weight due to inconsistencies with the medical evidence as a whole and with Dr. Singh's own treatment records.  For instance, Dr. Singh opined that Plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds frequently, which the ALJ afforded considerable weight. (Tr. 14) However, the ALJ correctly noted that Dr. Singh's opinion that Plaintiff could only sit one hour,

stand 5 minutes, walk 30 minutes and never stoop during an 8-hour work day was inconsistent with Plaintiff's own reports of activities he could perform and inconsistent with medical records indicating Plaintiff could return to work four days after stent placement. (Tr. 18) While Dr. Singh placed sitting restrictions on Plaintiff, he remained seated during the hearing with no apparent difficulty. (Tr. 14)

More importantly, Plaintiff did not allege any difficulty with sitting and noted in his Function Report that he was able to sit at the computer for 2 to 3 hours at a time. (Tr. 209) In addition, the ALJ properly noted that Dr. Singh's own medical source statement indicated Plaintiff could drive, shop, travel, ambulate without the use of aids, walk a block, climb a few steps, prepare simple meals, and care for his personal hygiene. (Tr. 14) Indeed, Plaintiff stated he was able to go out to eat, mow the lawn at times, shop, go on walks, and perform household chores. (Tr. 202) These inconsistencies between the limitations set forth by Dr. Singh and Plaintiff's daily activities undermine Dr. Singh's opinion. Owen v. Astrue, 551 F.3d 792, 799 (8th Cir. 2008). In addition, Plaintiff acknowledged that he applied for and received unemployment benefits during the time he alleged disability, indicating that he was ready, willing, and able to work. (Tr. 31) That he sought disability benefits as well undermines his credibility. Carpenter v. Astrue, No. 4:07CV1611 DJS, 2008 WL 3306298, at *16 (E.D. Mo. Aug. 7, 2008).

Further, Dr. Singh's Heart Classification of II denotes slight, mild limitations of activities and indicates that the patient is comfortable with rest or mild exertion. (Tr. 18, 1021) Dr. Singh's opinions with regard to Plaintiff's limitations are inconsistent with this assessment and appear to be based on Plaintiff's subjective complaints, not objective findings. In addition, her own treatment notes are inconsistent with the restrictions listed in her opinions. For instance, in October 2008, Dr.

Singh advised Plaintiff to exercise. (Tr. 244) In April, his physical examination was normal, despite reporting shortness of breath. (Tr. 247-48) In addition, his cardiomyopathy, hypertension, and sleep apnea were improved with medication. (Tr. 249) Dr. Singh's opinions regarding disabling symptoms were based on Plaintiff's subjective complaints and not objective findings, which supports the ALJ's decision to give Dr. Hicks' opinion non-controlling weight. Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (citation omitted). In addition, medication was successful in controlling Plaintiff's cardiomyopathy, hypertension, and sleep apnea. "An impairment which can be controlled by treatment or medication is not considered disabling." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted).

In short, substantial evidence supports the ALJ's decision to discount the opinions of Dr. Singh, as the medical source statement and letters were inconsistent with Dr. Singh's notes, the medical evidence in the record, and Plaintiff's description of his activities. Teague v. Astrue, 638 F.3d 611, 616 (8th Cir. 2011). Further, although Plaintiff contends that the ALJ should have contacted Dr. Singh for clarification, the Court finds that the ALJ had sufficient medical evidence from Dr. Singh to make a determination. "[A] lack of medical evidence *to support a doctor's opinion* does not equate to underdevelopment of the record as to a claimant's disability, as 'the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.'" Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir.2007)). Therefore, the ALJ was not required to re-contact Dr. Singh for further development.

### B. VE Testimony

Next, the Plaintiff argues that the ALJ failed to elicit testimony from the VE to clarify a

conflict with the Dictionary of Occupational Titles (DOT). Specifically, Plaintiff asserts that the job of stock or warehouse supervisor would require Plaintiff to work outside in a yard and in large warehouses, which would include extreme heat and cold. Because the ALJ did not resolve this "apparent" conflict between the VE's testimony and the DOT, Plaintiff contends the case should be remanded for further evaluation. Defendant responds that Plaintiff's argument is contrary to the DOT definition.

According to the DOT, the position of stock supervisor explicitly states that exposure to weather, cold, heat, and wet and/or humidity are "Not Present." DICOT 222.137-034, 1991 WL 672071. No conflict exists between the DOT and the VE's testimony. Thus, the ALJ properly relied on the VE's testimony that Plaintiff was capable of performing his past relevant work as a warehouse supervisor as that job is performed in the national economy. Therefore, this Court finds that substantial evidence supports the ALJ's determination that Plaintiff is not disabled, and the decision of the Commissioner should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time

for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this  4th  day of March, 2013.